UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

UNITED STATES OF AMERICA,

           -   against –                            18 CR 580 (KPF)

AURORA SANCHEZ,

                          Defendant.

------------------------------------------------------------------ X

## <u>SENTENCING MEMORANDUM OF DEFENDANT AURORA SANCHEZ</u>

Defendant Aurora Sanchez through her undersigned counsel, respectfully submits this Sentencing Memorandum for the Court's consideration in connection with her sentencing scheduled for August 27, 2019. We respectfully request that the Court adopt the recommendation of the Probation Department and sentence Ms. Sanchez to 60 months imprisonment.

The pain and attendant humiliations that go hand-in-hand with incarceration are something counsel and, respectfully, the Court, no matter how experienced, can only guess at. The loss of freedom for a few days, let alone for years, is unimaginable to most of us. And for Ms. Sanchez personally, the pain of incarceration has been more acutely felt than by others as she has watched both of her children be adversely affected by her incarceration.

Ms. Sanchez accepts full responsibility for her conduct and nothing herein is intended to minimize or excuse it. She is truly remorseful for her actions and has been since the day counsel met her. The last nearly 14 months in the Metropolitan Correctional Center have been very difficult for Aurora. She has had countless hours to reflect upon the awful decisions that brought

her here. On a daily basis she is reminded that her conduct has had a serious negative impact on both of her children's lives, and that has been its own form of punishment.

As discussed in more detail below, in light of all of the factors enumerated in 18 U.S.C. § 3553(a), we respectfully request that the Court impose a sentence of the mandatory minimum, 60 months, as recommended by the Probation Department. Such a sentence would address the Court's mandate to impose a sentence which is "sufficient, but not greater than necessary" to meet the goals of the Sentencing Reform Act.

## I.      Aurora Sanchez's Personal History

Aurora Sanchez, 40 years old, was born in Brooklyn and raised in the Bronx, New York. When she was three years old, her father was deported to Costa Rica. Ms. Sanchez has no memory of him as he played no role in her life after he was deported. He never made any efforts to support his children, either financially or emotionally.

While Ms. Sanchez's mother did her best to raise her children, she struggled with her own demons and often left a young Ms. Sanchez and her brother to fend for themselves. Aurora's mother was a drug addict and a heavy drinker that struggled to stay sober. At times, she was absent from the home for days. Ms. Sanchez recalls wandering the streets as a child looking for her mother. In the 1980s, Boynton Avenue in the Bronx had a high crime rate and violence was not uncommon.

Ms. Sanchez's older brother, Walter Sanchez, recalls how hard it was for a young Aurora when her mother would disappear: "[I]t did not sit well with my sister. She would cry and worry about our mother and would want to go out looking for her. Eventually, [our mother] would show up coming down from whatever high she was on at the time and then sleep it off for a day

or so leaving us again to fend for ourselves. This routine played itself over and over again for the next few years …." Exhibit A, Letter of Walter Sanchez.[1]

At the age of 14, Ms. Sanchez began dating a local drug dealer, Jason. Less than a year later, she became pregnant with his child. As her brother recalls, Aurora found "the love and security in a person that she never really had at home growing up." Id. When Ms. Sanchez's mother learned her 15-year old daughter was pregnant, she left her daughter to largely fend for herself and moved to Brooklyn to be with a man she was dating (who was married and had a family with another women). Ms. Sanchez, only a child herself, was often raising the child on her own, as the father was in and out of jail the first few years of their daughter's life. While he was incarcerated Ms. Sanchez struggled, but did her best to survive and raise her daughter. Ms. Sanchez and Jason eventually separated after she accused him of not being faithful to her. While she was pregnant with her first child, Ms. Sanchez continued to attend high school, but the school was far from her home and it eventually became too difficult for her to travel and she dropped out of high school.

Several years later, Ms. Sanchez met another man, Samuel, who unfortunately was also a drug dealer. After four years together, Ms. Sanchez, then 24, and Samuel had a son. While Aurora and Samuel stayed together for nearly 15 years, it was not a good relationship. Samuel was a jealous and controlling man. He was verbally, physically and psychologically abusive. Ms. Sanchez called the police on him several times.[2]

---

[1] All of the letters submitted on Ms. Sanchez's behalf are attached alphabetically by the writer's last name as Exhibit A.

[2] The discovery produced in this case confirmed several "Domestic Incidents" reported to the NYPD.

Samuel also had several periods of incarceration related to his drug dealing, including being in jail when their son was born. At one point, Ms. Sanchez was living in a shelter with her two young children. She, however, stayed with Samuel, often out of desperation and fear, as well as for the sake of her son, who was very close with his father. She also saw what it was like for her daughter to grow up without her father and she did not want the same for her son.

Sadly, Ms. Sanchez allowed herself to be completely dependent on the men in her life. Despite being a smart young woman, she let her life be dictated by what was going on in their lives. For example, her prior offense (immigration fraud) was committed while Samuel was in jail and Ms. Sanchez was desperate for money. In his absence, she made a horrible decision. One that she unfortunately did not learn from.

In June 2017, Samuel was incarcerated again, and he was recently sentenced to 70 years in prison. The instant offense occurred while Samuel was in jail and the conduct committed by Ms. Sanchez was with individuals she met through Samuel. Because Ms. Sanchez had become so reliant on him, she once again became desperate and made the extremely poor decision to engage in the instant offense. A decision she regrets and a mistake she swears to never make again.

Ms. Sanchez's offense conduct, however, does not tell her full story. She is a devoted and loving mother, and her two children are her everything. Her daughter is now 24 years old and her son is 14 years old. Annexed hereto as Exhibit B are photographs of her son and daughter.

Ms. Sanchez's dedication to her children is evident in the letters of support. Tamara Garcia recounts how in her discussions with Ms. Sanchez "[s]he would always express her struggles as a single mother and wanting the best for her two children. She always expressed how important education is and tried her best to make sure that her children received the best education …." Exhibit A, Letter of Tamara Garcia. Caridad Vasquez used to babysit Ms.

Sanchez's children and she describes Aurora's "character as kind hearted and [a] loving mom." Id., Letter of Caridad Vasquez. In her letter, Jennifer Aviles notes that "Mrs. Sanchez attended all [of her children's] school meetings [and] would volunteer her time for all school events." Id., Letter of Jennifer Aviles.

Ms. Sanchez's incarceration has been extremely difficult for both of her children and the detrimental effect it has had on them weighs heavily on Ms. Sanchez. Her daughter dropped out of school where she was studying to be a dentist, shortly after her mother's arrest. She is currently working as a bartender. She recently was arrested for a DWI and in a serious car accident. Ms. Sanchez blames herself.

Ms. Sanchez's 14 year son has also submitted a letter on his mother's behalf. See id., Letter of J███ L███. He writes that his mother "loves us endlessly" and is a "kind hearted person who always do anything for her loved ones as long as she could." Id. He says all his mom asks for "in return from me and my sister is to finish school go to college and get a hard working job." Id. While J███ is sad his mother has missed important events in his life, he also notes that he is working "twice as much harder not for me but for my mother because I know it put joy in her hear when she hears her son doing good." Id.

Ms. Sanchez's mother has submitted a letter to your Honor as well. In her letter, Edna Santarella asks that Your Honor give her daughter a second chance, the same way she got one. See id., Letter of Edna Santarella. Ms. Santarella acknowledges her flaws as a mother, including being an addict, suicidal and depressed. See id. She also spoke of her daughter being the mother she was not:

> [Aurora] gave her children love and taught them respect for others, to be a better person than she is and always respect the law and do good with their studies. An exceptional mother and a caring daughter. And of course not expecting anything in return.

<u>Id</u>.

Since her arrest, Ms. Sanchez's brother and his wife have taken legal temporary custody of her son. It has not been an easy adjustment for her son. Unbeknownst to everyone, █████████ ██████████████████. His acting out and bad behavior became so bad that a few months ago her brother did not think he could continue to care for him. ████████████████████ ████████, he is still having a difficult time adjusting to life without both of his parents. As recently as only a few days before the filing of this submission, Ms. Sanchez learned that her brother has decided that he can no longer care for her son and that he will be moving to Florida to live with his father's brother.

Ms. Sanchez's sister-in-law, Ursula Sanchez, sees "on a daily basis how much [J███] misses his mom." Ex. A, Letter of Ursula Sanchez. Ursula has also witnessed firsthand Aurora's determination "to be the best mom she possibly could." <u>Id</u>. Ursula also has seen Ms. Sanchez's "strong remorse for her mistakes." <u>Id</u>.

Both her mother and brother have also witnessed Aurora's remorse. Her mother writes: "I strongly believe that once given the opportunity she will cherish it and try and build a better future for her children." <u>Id</u>., Letter of Ms. Santarella. Her brother echoed his mother's sentiments: "I know in speaking with her she is not only remorseful but embarrassed for what she has done and the situation she has put her kids in. I believe if given the opportunity she will do the best to turn not only her life around but her children's lives as well." <u>Id</u>., Letter of Mr. Sanchez.

Ms. Sanchez suffers everyday knowing that her actions have had a severe negative impact on both her children. She can barely speak about her children without becoming emotional and sobbing. Ms. Sanchez's brother notes that "as tough as [Aurora's upbringing] may

have been nothing has been harder on her than this past year. Not being able to be in her children's lives, missing their birthdays, holidays and even her sons' graduation from middle school has been hard on not only her but them a well." Id.

### A.     Horrific Conditions at MCC

Under ordinary circumstances, pre-trial detention in a maximum security facility is difficult. But it has recently come to light just how horrific the conditions are for the women incarcerated at the Metropolitan Correctional Center ("MCC").

In May 2019, in response to numerous reports of public health-related issues, the Federal Defenders of New York requested a tour of the women's unit at the MCC. A copy of the memorandum dated May 25, 2019 prepared by Deirdre D. von Dornum, Attorney-in-Charge, Federal Defenders, is annexed hereto as Exhibit C. Ms. von Dornum's memorandum should shock the conscience of anyone who reads it.

The reported issues included "raw sewage flooding the unit from overhead pipes that had burst, rodent and cockroach infestations, spoiled food, black mold on floors and ceilings where water had leaked through from below and above, and filthy air vents." Id. at 1. Despite attempts to clean-up the unit prior to her visit, Ms. von Dornum witnessed conditions that simply should not exist in a federal detention center in the United States of America. She saw vermin, rodent feces, mold infestation and generally unsanitary conditions.

Indeed, Ms. Sanchez has reported being woken up in the middle of the night by a mouse or rat crawling on her bed. In April or May 2019, the unit where Ms. Sanchez is housed was flooded with feces and the inmates had to clean up two to three inches of feces. They were not given any safety or protective wear.

7

Ms. Von Dornum's memorandum also discusses the inadequate health care provided to the women at the MCC. Ms. Sanchez has personally been on the receiving end of poor medical care. In December 2018, she seriously injured her knee. Her knee was red, visibly swollen and Ms. Sanchez was crying in pain. Instead of seeing a doctor or physician's assistant, she was put in the Special Housing Unit in the women's unit for several days. Several fellow inmates have provided written accounts of Ms. Aurora's neglect and the pain that she was experiencing. See Exhibit D (collection of letters from female inmates at MCC). When she was finally taken to the hospital, the doctor indicated that Ms. Sanchez needed an MRI. It took four months before Ms. Sanchez was taken back to the hospital for an MRI. During this period of time, her knee continued to stay swollen and the pain did not subside. It took until June 2019 for Ms. Sanchez to finally receive physical therapy to treat her injured knee.

In addition to the public health-related issues, the MCC also has a history of canceling family visits because lack of staff. Inmates are also regularly "locked-in" (confined to their cells nearly all day) because of staff shortages. This is a regular occurrence on the weekends (which is consistent with the oft-canceled attorney visits on the weekends due to lack of staff).

At the time of her sentencing, Ms. Sanchez will have spent nearly 14 months incarcerated at the MCC. While the law provides for pre-trial incarceration, it certainly does not justify being incarcerated under these conditions. We ask that in sentencing Ms. Sanchez, the Court take into consideration the truly awful conditions she has endured for the last 14 months at the MCC.

## II.   Plea Agreement

On April 24, 2019, Ms. Sanchez pleaded guilty to the lesser included offense of conspiracy to distribute and possession with intent to distribute 50 grams or more of methamphetamine, pursuant to 21 U.S.C. Section 841(b)(1)(B). With a total offense level of 31

and a criminal history category of I, the Guidelines Range is 108 – 135 months. The plea agreement also provides that either party may ask the Court to consider a sentence outside the advisory Guidelines range based upon factors set forth in 18 U.S.C. § 3553.

## III.   Applicable Sentencing Law

As the Court is well aware, the Sentencing Guidelines are advisory and while they serve as one of many factors to be considered, the inquiry does not end there. When imposing sentence, the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)[3] in order to create an "individualized assessment" based on a defendant's particular circumstances. Gall vs. United States, 552 U.S. 38, 49-50 (2007); see also United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." Cavera, 550 F.3d at 188.

The Court has ample discretion to impose a below-Guidelines sentence. See Kimbrough v. United States, 552 U.S. 85, 101-10 (2007). In doing so, the Court may consider, and rely upon, any information available concerning the background, character, or conduct of the defendant. See Cavera, 550 F.3d at 189-91; see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an

---

[3] The relevant factors are: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed" to, inter alia: provide just punishment, deter criminal conduct, protect the public from any future crimes by the defendant, and provide the defendant with rehabilitative training and treatment; (3) "the kinds of sentences available"; (4) "the kinds of sentence and the sentencing range established" for the offense; (5) "any pertinent policy statement"; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and (7) "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

offense for which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Moreover, in making an "individualized assessment," the Court is not only empowered to impose a sentence below the Guidelines range, it is required to do so where a lower sentence would be sufficient to comply with the purposes of Section 3553(a). See, e.g., United States v. Dorvee, 616 F.3d 174, 183-84 (2d Cir. 2010); United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006). Moreover, the Guidelines carry no presumption of reasonableness. As noted in Nelson v. United States, 129 S. Ct. 890 (2009), where the Court summarily reversed the Fourth Circuit which had upheld a district court's application of a presumption of reasonableness to the guidelines:

> [t]he Guidelines are not only *not mandatory* on sentencing courts;
> they are also not to be *presumed* reasonable.

Id. at 892 (emphasis in original).  Thus, the guidelines are now only one factor to be considered in the formulation of a minimally sufficient individualized sentence.

This view is consistent with the long-standing principle that a Court consider "every convicted person as an individual" and that "the punishment should fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (2011). In sum, the overarching task of a sentencing court is to fashion a sentence that is appropriate for the individual circumstances of the offense and the defendant, and is "sufficient, but not greater than necessary" to achieve the statutory goals of punishment, deterrence, and rehabilitation. 18 U.S.C. § 3553(a).

## IV.   A Sentence of 60 Months is Sufficient But Not Greater Than Necessary

Aware of all of the relevant facts, the Probation Department recommends to the Court a variance of a 60 month sentence. To quote Probation: "We believe that a custodial sentence

would serve to reflect the seriousness of the offense and afford adequate deterrence to criminal conduct. As such, it is our view that 60 months' imprisonment would be sufficient but not greater than necessary, to comply with the factors to be considered in imposing a sentence outlined in 18 U.S.C. § 3553(a)." PSR at p. 18.

Perhaps for the first time in her life, Ms. Sanchez fully recognizes that she has made extremely poor choices in the past. She has dated the wrong men, and made disastrous and illegal decisions in an effort to support herself and her family. She is absolutely committed to living her life as a law-abiding citizen.

While being away from one's children is difficult for any parent, at noted by Probation, Ms. Sanchez's "behavior and incarceration has resulted in an unfavorable adjustment for both of her children." PSR at p. 18. Her daughter dropped out of school, and her 14 year old son is struggling behaviorally and is having a difficult time adjusting to having both of his parents incarcerated.

The sentence that we urge the Court to impose – 60 months – would reflect the seriousness of the offense, promote respect for the law and provide just punishment. While the nature and circumstances of the offense are serious and involve dangerous narcotics, at the time of her sentencing, Ms. Sanchez has served a very difficult nearly 14 months in the harsh confines of maximum security at the MCC. A sentence of 60 months is not an insignificant amount of time and would reflect the seriousness of the offense. It would require Ms. Sanchez to serve approximately three and a half more year in prison.

As to specific deterrence, a sentence of 60 months is adequate to serve the goals of specific deterrence. Ms. Sanchez has had a difficult time adjusting to federal detention and it has

not been easy for her.[4] She has had ample time to reflect on both the wrongness of her conduct as well its dangerousness. Ms. Sanchez has accepted responsibility for her conduct. Her remorse appears genuine, as well as her deep shame and embarrassment for her conduct. She knows that she has failed her children and becomes emotional whenever she speaks of them. Ms. Sanchez does not allow her mother or other family members to come to Court because she knows it is difficult for them to see her in shackles. Ms. Sanchez has also expressed that she does not want any family or friends at her sentencing because she does not want to subject them to the experience.

We respectfully submit that a more extensive period of incarceration is not needed to restore Ms. Sanchez to moral standing within the community. Substantial incarceration will not have any further constructive retributive effect. At some point, the addition of incremental months to Ms. Sanchez's jail sentence no longer promotes the goals of sentencing, and instead become retribution. See United States v. Jenkins, 854 F.3d 181, 192 (2d Cir. 2017) ("Additional months in prison are not simply numbers. Those months have exceptionally severe consequences for the incarcerated individual.").

A sentence of 60 months will also provide adequate general deterrence to the criminal conduct of others. The public is now on notice that offenders will not get a pass for commit crimes of the sort prosecuted here. There will be a multi-year sentence. In addition, the effect of harsh sentences as "general deterrents" is questionable. Social science appears to undermine the notion that lengthy sentences will deter others from committing similar crimes. See Amy Baron-Evans, Sentencing by the Statute, pp. 7-9 (April 27, 2009, revised Dec. 21, 2010) ("…potential

---

[4] Ms. Sanchez has, however, used her time constructively. Attached as Exhibit E are certificates from classes she has taken while at the MCC, including 32 program class hours of "Parenting Inside Out."

criminals … do not believe [that] they will be apprehended and convicted," and therefore, they do not "consider sentence consequences in the manner one might expect of rational decision makers") (citing Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A review of Research 28-19 (2006)), a copy of Ms. Baron-Evan's article be found at https://nyn.fd.org/content/sentencing-statute-amy-baron-evans-2009.

Because there is no evidence to suggest that sentencing Ms. Sanchez to a more severe punishment will lead to a reduction of crime through general deterrence mechanisms, it is respectfully submitted that a sentence of the mandatory minimum is "sufficient, but not greater than necessary" to achieve the statutory goals of deterrence. To the extent that the Court has observed that at least some potential offenders are deterred from committing future crimes by the sentences of others, we respectfully submit that a sentence of 60 months will produce that effect.

As is indicated by the foregoing analysis, the various relevant factors set forth in Title 18 United States Code Section 3553(a) all weigh in favor of a sentence of time served.

**V.**     **Conclusion**

For all the foregoing reasons, Aurora Sanchez respectfully requests that the Court impose on her a sentence of 60 months.

Dated: August 13, 2019
        New York, New York

By:     _____/s/_____
        Diane Ferrone, Esq.
        The Law Offices of Diane Ferrone PLLC
        1740 Broadway, 15th Fl
        New York, New York 10019
        (646) 337-9010
        diane@dianeferronelaw.com

        *Attorney for Defendant Aurora Sanchez*

13

# EXHIBIT A

July 15, 2019

Your Honor,

Re : Character reference for Aurora Sanchez

I have known Aurora Sanchez since the year 2006 when both her children attended school as both my boys.

Mrs. Sanchez always took good care of her children she was so kind and loving to them not to mention over protective at times. Mrs. Sanchez attended all school meetings, she would also volunteer her time for all school events. As the years progressed, we also grew a great friendship she would advise me in so many different aspects of life. She is a very caring and loving person. Always willing to help others and give her best to her children.

I am saddened and in disbelief Mrs. Sanchez has been submitted to such charges. Mrs. Sanchez is such a loving and caring person. Her children miss her immensely. I hope this is taken into consideration during her sentencing.

Sincerely,

Jennifer Aviles

Credit manager

July 17, 2019

Your Honor,

Re: Character Reference for Aurora Sanchez

I am providing this reference in full knowledge of Ms. Sanchez charges.

I met Ms. Sanchez in the year 2010 through a mutual friend. We would see each other at friend's gatherings such as birthday parties, birthday dinners, family outings, BBQs, and picnics. Ms. Sanchez would always bring her two kids with her. She would always express her struggles as a single mother and wanting the best for her two children. She always expressed how important education is and tried her best to make sure that her children received the best education, despite her struggles as a young single mother of two children. Ms. Sanchez is a good person, very friendly, sweet, outgoing, and generous. She is a daughter, a sister, a mother, a friend, and we miss her dearly. Her mother, her kids, her family members, and her friends are very heart broken and suffering every day for her.

Your Honor, growing up in the South Bronx comes with a lot of challenges and struggles in life, which brings a lot of insecurities to a person especially for single mothers who are the providers to their family. I'm not condoning what Ms. Sanchez did but I do believe that she has learned her lesson and has reflected on all the bad decisions and choices that she has made. Under the pressures of life and being raised in what is considered "The Ghetto". Please give her another chance so that her son and daughter could be with their mother. This experience has been very traumatic for them. As you know Your Honor, daughters and sons need their mothers' in their lives. As a mother it is very heartbreaking for her to raise and to see her daughter and son under these circumstances. Please give her another opportunity.

Sincerely,


Tamara Garcia

To my Mom

When I think of My Mom I think of
a kind hearted person who always do anything
for her loved ones as long as she could. Only thing
she wanted in return from me and my sister is to
finish school go to college and get a hard working
Jobs and she'll support us in any thing we do as long
as its better than her. My Mother has always been
good to me and my sister, she would take us on the
best vacations buy us nothing but the best, she did
everything for us that she wanted as a child but
never got. She loves us endlessly She showed us
always to respect the law and showed us that
if someone need something more than us it always
better to give than to recieve. Another lesson she
taught us was to always take responsibility
for your actions nomatter what the consequences are.
This year I experienced so many critical things
without my mother this year like her not attending my Junior
highschool graduation, my first day of highschool, and her
not attending my basketball games. this is also
the first time me and my mother have been so far
apart, this is the first time I been away
from my house, my dogs, my sister, my friends, my school
I have also worked twice as much harder not
for me but for my mother because I know
it put Joy in her heart when she hears her son
doing good

Sincerely, J████ L████

Ursula Sanchez

███████

Yorktown Heights, NY 10598

July 10, 2019

RE: Aurora Sanchez

To The Honorable Judge,

I am writing in behalf of my sister- in -law Aurora Sanchez. I have known Aurora or as lovingly will call her "Minnie" for approximately 26 years.

I met Aurora at a very young age. Aurora has always been a strong, loving and caring person. Aurora and my husband share a very unique bond, the kind of bond established thru all their shared experiences. Although, Aurora became a mother at a very young age, her daughter then was her main priority. She was determined to be the best mom she could possibly be. Her number one priority was to ensure her daughter's well-being. She wanted in many ways a different life for her daughter than she had. While Aurora only completed middle school, she ensured that her daughter worked as hard as she possibly could. Subsequently, she had her second child, J███, the apple of her eye. She struggled at times mostly being a single parent dealing with a child with special needs and trying the best she could with the limited skills she possessed. Personally, I was very proud to see her work, when she worked at an office and at the same time juggled all her parental duties. I admired the strength, and will she possessed to ensure that her family was well.

My husband and I are now raising her son J███. I see on a daily basis how much he misses his mom and how much she misses him. She has expressed a strong remorse for her mistakes and desire to establish a better life for her and her kids. I strongly believe that once given the opportunity she will cherish it and try to build a better future for her and her children.

Sincerely,

Ursula Sanchez

Walter Sanchez

██████████
Yorktown Heights, NY 10598

August 5, 2019

Dear Judge Failla,

I am Walter Sanchez, Aurora Sanchez older brother.  I have known my sister for 40 years.  I am writing this letter on behalf of my sister in hopes to show that she's not a bad person but just a person who made some bad choices.

I know my sister is a good person.  She has always shown to care for everyone around her and is always willing to help anyone in need especially her family.  Unfortunately, she has made some bad choices in life which have led her to be where she is today.  I'm not a person that believes in excuses but I do believe that our upbringing had a lot to do with our paths in life and the choices she felt she had to make.

For the most part, my sister and I grow up together apart from our other two siblings.  We share the same mother and father.  We haven't seen our father for over 35 years, I am now 43 and my sister is 40.  My mother was a single mom who raised us on her own and I guess did the best she could do.  For the early part of our lives, my mother was around but as we got older she would disappear for days at a time.  At this point, I was aware my mother had a substance abuse problem, I was about 10 years old and my sister was 7 years old.

I had grown to be a bit independent and my mother disappearing for a day or two did not bother me as much but on the other hand, it did not sit well with my sister.  She would cry and worry about our mother and would want to go out looking for her.  Eventually, she would show up coming down from whatever high she was on at the time and then sleep it off for day a or so leaving us again to fend for ourselves.  This routine played itself over and over again for the next few years until my mother met a man she whom she declared to be our "step-father".  They dated for many years and for my sister he filled the father role she never had.

At this point, my mother cleaned herself up for a year or so but eventually, she was back to doing what she always did.  By this time I was about 12 years old and my sister was about 9 years old.  I didn't care as to what was happening with my mother but my sister couldn't help but worry and cry for her.  She would go on car rides with my mothers' boyfriend looking for her and eventually finding her at some bar in the middle of the night.  After finding her she would witness them fighting not only verbally but at times physically as well.  Over the next few years, things would repeat themselves but eventually, my mother would once again clean herself up.

I was about 15 years of age and my sister was about 13 years old.  My mother decided she would move to Brooklyn with her boyfriend to his place and leave my sister and I the apartment in the Bronx.  At this time my sister was in middle school and started hanging around with the wrong crowd and without adult supervision, she was able to do what she wanted with no one to tell her otherwise.  She would hang out at all hours of the night with friends at parties or in clubs.

Eventually, she became pregnant from an older guy and had her first child at 14-15 years old.  At this point, my sister moved in with this individual who was able to find the love and security in a person that she never really had at home growing up.  She relied on him to provide for her and their child.  Unfortunately, things didn't work out for them and at the age of 24, my sister found herself homeless.

My mother had moved to Florida during this time and thought it would be best for my sister to move in with her.  Reluctantly my sister agreed but unfortunately, things wouldn't go as planned for her and the one person whom she thought she could rely on for help wasn't able to help her.  She returned to New York hoping to again restart her life but didn't want help from the family.  She moved into a shelter with her daughter and eventually got on her feet again.

My sister would eventually meet the father of her son. In him, she also found what she lacked growing up.  He was able to provide for her and the kids.  Eventually, things didn't work out for them and she found herself almost in the same predicament as she was when she split from her daughters' father.  I believe going through what she went through years earlier and not wanting to put her children through that ordeal is what led her to these bad decisions.

This is just a brief summary of the upbringing she had and as tough as it may have been nothing has been harder on her than this past year. Not being able to be in her children lives, missing their birthdays, holidays and even her sons' graduation from middle school has been hard on not only her but them as well.  Having her children see her in this situation has been a humiliating and humbling experience for her.  I know in speaking with her she is not only remorseful but embarrassed for what she has done and the situation she has put her kids in.  I believe if given the opportunity she will do the best to turn not only her life around but her children's' lives as well.

Yours very truly,

Walter Sanchez

[THE ORIGINAL HANDWRITTEN LETTER IS ATTACHED.]

To whom it may concern,

My name is Edna M. Santarella and mother of Aurora Delpilar Sanchez.

Aurora always has been an exceptional person. From the moment she was born, a very peaceful, passive and a good baby, with a smile of an angel. She was a miracle baby. Despite of her traumatic life growing up without a father in which was an alcoholic, a mother who was an addict, suicidal and depress mother. No child deserves to endure a horrific life her parents gave her. She suffered tremendously and no child of 8 years old deserves that life. It has been very difficult for Aurora growing up in that environment.

Aurora never complained or criticized me, and I saw her in her eyes of her suffering. She cared about me and always looked for me in the streets to make sure I was safe. She became at a young age a mother of a beautiful baby girl and of course took care of her properly and gave her the love she never had. Then became a mother a second time to a beautiful boy. She gave her children love and taught them respect for others, to be a better person than she is and always respect the law and do good with their studies. An exceptional mother and a caring daughter. And of course not expecting anything in return.

Her kindness and her loving loving hear she gave to everyone. Aurora's is a woman with a warming heart, especially with those who are homeless as well as pets. She will feed and dressed the homeless and the abandoned pets on the streets. She will keep them warm an feed them.

Everyone loves Aurora dearly. She lived a life not for herself but for others. My daughter Aurora is a strong woman and I know that she has remorse and I'm very sure that God will be watching over her and giving her strength. I pray every day and I kneel before God for her safety and to give her a second chance in life for a new beginning.

Everyone, every human being deserves a second change. I am proud to call her my daughter for she cared about me like no other. She's the "Love of My Life." I'm lost without her. I believe that his nightmare will end soon and she'll be home to her suffering children and family who misses her dearly. Her children are lost without their mother. She always did everything with them and never were apart.

I will always be waiting for her return home. I wasn't to tell Aurora I am so sorry for all she has been through. She doesn't deserve it. Is it my punishment to suffer from God. He gave me a second chance in life and I know deep in my suffering heart that she will get a second chance as well.  May the Lord protect you and watches over you. I love you always Aurora. Be strong and stay focus. Educate yourself. Never loose your kindness, your love for others.

To whom it may concern;

My name is Elena M. Santrella mother of Aurora Del Pilar Sanchz. Aurora always has been an exceptional person. From the moment she was born, a very peaceful, passive and a good baby, with a smile of an angel. She was a miracle baby. Despite of her traumatic life growing up without a father in which was an alcoholic, a mother who was an addict, suicidal and depress mother. No child deserves to endure a horrific life her

parents gave her. She
suffered tremendously.
And no child at the age
of 8 years old deserves that
life. It has been very
difficult for Aurora growing
up in that environment.
Aurora never complaint
or critized me, but I saw her
in her eyes of her suffering.
She cared about me and always
looked for me in the streets to
make sure I was safe. She
became at a young age a mother
of a beautiful baby girl and
of course took care of her
properly and gave her the love
she never have. They became a
mother a second time to beautiful
boy. She gave her children love
and taught then respect for others.
To be a better person than she is
and always respect the law and
do good with their studies.
An exceptional mother and
a carry daughter. And of course
not expecting anything in return.
Her kindness and her long
loving heart she gave to everyone.

Amira's is a monson with a warmy heart, especially of those who are homeless as well as pets. She will feed and dressed. The homeless and the abandoned pets in the streets she will keep them warm and feed then.

Everyone loves Amira dearly. She lived a life of not for herself but to others. My daughter Amira is a strong woman and I know that she has remorse and Im very sure that God will be watching over her and giving her strength. I pray every day and I kneel before God for her safety and to give her a second chance in life for a new beginning.

Everyone, every human being deserves a second chance. Im proud to call her my daughter for she cared about me, like no other. She's the "Love of My Life" Im lost without her. I believe that this nightmare will end soon and she'll be home to her suffery children and family who misses her dearly.

Her children are lost in Trust
their mother. She always did
every Thy with then. and never
were apart.
  I will always be waiting for
her return home. I want to tell
Amara I'm so sorry for all
she has been thru. She doesn't
deserve it. It is my punishment
to suffer from God. He
gave me a second chance in
life and I know deep in my
suffering heart That she will get
a second chance as well. May the
Lord protect you and matches
over you. I Love You always
Amara. Be strong and stay
focus. Educate yourself. Never
loose your kindness, you love
for others.
                    Your mother!!

July 14, 2019

Your Honor,

Re: Character reference for Aura Sanchez

I am providing this reference in full knowledge of Mrs. Sanchez charges.

I have known Mrs. Sanchez since the year of 2005 when I use to babysit both her children for about a year at the ages of 2 and 9.  I will get paid by the Human Resources Administration while Mrs. Sanchez was out searching for employment. Mrs. Sanchez always had her children well -groomed and they were always well nourished.  Mrs. Sanchez will always provide food that the children enjoyed and will also provide extra clothing for them.  Mrs. Sanchez was very sweet and caring towards her children at all times.  Mrs. Sanchez was always very polite and considerate of my employment and will treat me like a friend.  I met Mrs. Sanchez thru a mutual friend and it was a coincidence that we both attended the same high school however we never met in our high school years.  As the years progressed I continued to see Mrs. Sanchez via a different mutual friend and I will see her at events such as mutual friend birthdays and celebrations.  Mrs. Sanchez remained very friendly and a very sweet person.  Mrs. Sanchez and I will sometimes chat on the phone for hours regarding our relationships with our significant others and our children's upbringing, sharing stories and advice.

I am in disbelief and It is with shame that Mrs. Sanchez has been submitted to such charges and mostly perplexed to attach such charges to such a decent lady.  I believe in my heart that if she is guilty or innocent that her character as a kind hearted and loving mom be taken in to consideration during her sentencing.  Mrs. Sanchez children miss her dearly and they are lost without the love of their mom.


Sincerely,



Caridad Vasquez BA (Psychology)
Care Manager

# EXHIBIT B



# EXHIBIT C

# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

## MEMORANDUM

To:   Chief Judge Colleen McMahon; Chief Judge Dora L. Irizarry; Judge Valerie Caproni
Cc:   AUSA Jeffrey Ostericher; AUSA David Jones; Adam Johnson (MCC Legal)
From: Deirdre von Dornum
Re:   Visit to MCC Women's Housing Unit (2nd Floor) on May 23, 2019
Date: May 25, 2019

In April and early May, the Federal Defender Office and CJA counsel received numerous reports of public health-related issues in the Women's Housing Unit at the MCC, including raw sewage flooding the unit from overhead pipes that had burst, rodent and cockroach infestations, spoiled food, black mold on floors and ceilings where water had leaked through from below and above, and filthy air vents. I reported these concerns to the SDNY U.S. Attorney's Office Civil Division and Legal Counsel for the MCC, Adam Johnson. A visit to the unit to observe the conditions was scheduled for Thursday, May 23, 2019 at 1 p.m.

On the morning of the scheduled visit, our office received calls and emails from women on the unit describing Correctional Officers telling them visitors were coming that day and ordering them to: scrub the entire unit with bleach to remove the mold, sweep up all rodent droppings, remove all rat traps from sight, clean all the air vents, remove all buckets that had been placed under leaks from the ceiling and light fixtures, and remove all clothing that had been placed in air vents to block them. Subsequent calls and emails described painting being done on the unit in places where there was evidence of water damage. Several women reported being ordered by the Correctional Officers to participate in the clean up or else they would be "sorry" after the visitors left.

I immediately passed on these reports of a compelled clean-up in anticipation of our visit to the Jeff Oestericher, Chief of the Civil Division in SDNY and to Adam Johnson.

I arrived at the MCC at 1 p.m., together with SDNY Federal Defender paralegal Todd Burrell. I had brought with me exam gloves, Q-tips, tape, and zip-lock bags so that, if there were visible environmental concerns, I could take samples. The CO who processed me through security had no objection to my bringing these items in from a security point of view.

1

After processing through security, we met with Adam Johnson, Acting Assistant Warden Lee Plourde, Stephanie Scannell (MCC Legal), David Jones (Deputy Chief, Civil Division, SDNY) and an investigator from the SDNY U.S. Attorney's Office.

AW Plourde expressed alarm at seeing that I had the Q-tips, tape, ziplock bags and gloves.  He took these materials from me and he and Mr. Johnson went into the AW's office for a closed-door meeting.  A few minutes later, they came out and AW Plourde said I could not bring any of these materials to the unit, and stated that he had been trying to reach BOP Regional Counsel to get advice on this.

Concern was also indicated about my bringing my business cards to the unit.  I explained that I would like women who had urgent concerns to be able to reach my office, and that I was particularly worried about women with non-Federal Defender counsel, who might not have funds to call their lawyers.  Adam Johnson permitted me to bring the business cards to the unit.

AW Plourde, Adam Johnson, Stephanie Scannell, David Jones, the SDNY USAO Investigator, Todd Burrell and I went together to the unit.  We were all there throughout the visit.  Mr. Burrell and I tried to see as much of the unit as we could, and to speak to as many different groups of inmates as possible.  Some of the women were eager to speak with us.  Others were not.  Still others expressed concerns about retaliation from the COs if they spoke with us.  A couple of women noted that on the last visit by the "Regional Office", none of the women had spoken out about their concerns because of fears of retaliation.

36 women are currently housed on the unit.  The majority of these women are defendants in the SDNY, with a handful of EDNY defendants as well, at least two women who were sentenced and designated a number of months ago but have not been sent to their designated facility because of "medical holds", and one state inmate held at MCC for a SDNY civil case.

**Clean-Up Prior To The Visit**

When we came out of the elevator and into the sally-port for the women's housing unit, there was a smell of fresh paint.  Upon entering the unit, women approached us to describe, in both English and Spanish, how they had been ordered to clean the unit that morning, and to get rid of all visible mold and rodent traps and droppings.  Some expressed that they had refused to participate and had told the COs that they wanted the visitors to see the conditions they live in.  Others expressed that they had preferred to participate in the clean-up rather than suffer any consequences of refusing.  They described new shower curtains having been brought in and hung that morning.  They described how, ordinarily, there are rat traps placed throughout the unit, particularly in the kitchen and laundry areas, but that they had been told to remove all of these prior to our visit.  They described how ordinarily there is black mold on the shower tiles and various parts of the ceiling, but they had been instructed to scrub as much of it as possible with bleach.  They noted that ordinarily they are not provided with cleaning supplies, other than water and Fabuloso.  They pointed out fresh paint (whose odor was evident) patches on particular ceiling areas where there had been evidence of severe water damage or mold. They stated that the painting had only concluded about one hour before our arrival.

When I inquired of AW Plourde about this apparent effort to cover up the conditions, the AW explained that several work orders had come through that day, just prior to our visit. Adam Johnson, by contrast, expressed concern.

Several women made efforts to indicate to me, either in Spanish, or with non-verbal motions, areas I should look at where full clean-up had not been done, including a shower area (shower #1) that still had visible black mold and a rear medical area that the COs did not have keys for. The women also pointed out evidence of water coming up through the floor tiles and down through ceiling fixtures, which they said happens with some frequency, and does not seem to be correlated with rain.

## Raw Sewage Floods and Clean-Up

Consistent with the reports we had received on the day this occurred, many women described a raw sewage flood on April 12, 2019, beginning at approximately 6:30 a.m. Feces and urine flooded the unit from pipes overhead, as well as overflowing toilets. Two of the women on Tier A described being locked in their cell with raw sewage up to their ankles and the toilet in the cell continuing to overflow with sewage. Other women described feces in their hair from above and raw sewage coming through the common area, into the small rec room, and throughout the shower areas. COs present on the unit instructed the women to clean up the sewage. They had no safety equipment. After several hours, the women were provided with gloves. Masks, pairs of boots, and safety goggles were also given out, several hours after the sewage flood occurred, but there were not enough for all the women involved in the clean-up effort. No effort was made to remove the women from the unit during the clean-up, or to identify women for whom the raw sewage might pose an increased health concern.

No public health or safety officer has come to the unit since the flood, as far as the women know. Several of the women, particularly those with HIV, lupus, and other immune-system-compromising illnesses expressed concern about hepatitis and other diseases from the raw sewage. They also expressed concern about insufficient sanitization of furniture, gym equipment and other stationary items following the sewage flood.

The women reported that a second sewage leak occurred in the 9th floor social visiting area on May 13, 2019. The social visits were abruptly cancelled.

## Rodents and Roaches

Numerous women described rats and mice infesting their cells, and running through the common areas, particularly in the laundry rooms. They reported seeing mice coming out of the toilets in their cells when they are locked in at night. During our visit, we saw one mouse run across the common area. Women also noted that when they receive commissary items, there are sometimes bite marks on them.

Case manager Olivera stated that there was not a rodent problem, and that the women had not mentioned any rats or mice to her.  Several women standing around the case manager thanked her for handing out more rat traps than the previous case manager had.

There was a locked medical room in the rear of the housing unit.  The COs and case manager did not have the keys to this room.  I asked to look at the medical room, and Adam Johnson requested that medical staff come to open it.  The corners of the room had rodent droppings on the floor.  Rodent droppings were also visible along the sides of the room, including directly next to the examination table.  There was mold in the corners of the room as well.

In addition, during a government expert evaluation of a Federal Defender client on Wednesday evening, May 22, 2019, conducted in the legal visiting rooms on the 3rd floor, the government expert noted to counsel that he heard repeated scrabbling in the walls and he believed it to be a rat infestation.

We did not see any cockroaches during our visit, but numerous women described seeing cockroaches throughout the unit, including in the kitchen area, and on food trays brought upstairs from the food preparation area.

**Black Mold**

Many women complained of black mold on the walls and floor tiles in the showers that returns right after it is cleaned.  They described mold on the shower ceilings, and the ceilings in the hallways outside the ceilings where there have been leaks, as well as mold on the shower tiles, and the floor tiles in rooms where water has come up from below repeatedly.

We saw small patches of black mold on the floor tiles in shower #1 and in one of the cells on B Tier that has its own shower, as well as mold on floor tiles in some cells.  The women pointed to areas on the ceilings that they said were covered with black mold prior to our visit, but had been painted with white paint that morning.  Shower #2 had visible leaks from the ceiling.  The women also noted that the black mold had been abundant in the "suicide room."  When we entered that room it smelled of fresh paint.

Several women complained of skin rashes and fungal infections on their feet, which they believed were caused by the black mold in the showers and other floor tiles. Two women showed me toenail beds where their toenails had fallen off, and spots on their feet that appeared to be bacterial infections.

**Unsanitary Food**

In addition to the concerns posed to their food by rodents and roaches, the women stated that they frequently receive produce that is rotten, particularly lettuce and apples. Many women complained of diarrhea from eating the food provided.

**Medical Treatment Concerns**

The women's unit is supposed to have access to medical care every Friday (when the men do not go to the doctor.). Many women reported frequent cancellation of these Friday visits due to either short staffing or a male medical emergency.

The near-universal complaint among the women was the lack of gynecological care, both for routine checkups, and for more urgent concerns, such as women with endometriosis, amenorrhea, or dysmenorrhea.

Individual women also described serious medical issues going untreated (I have records of all names and register numbers for each woman with whom we spoke who described ongoing medical issues, and I have already begun contacting their lawyers). For example, one woman in her 60s had no teeth and explained to me that she was told her family should bring her dentures to the facility, but when her family tried to bring her dentures at a social visit, they were told that they could not bring them into the facility, because to do so presented a security concern, so she has not had teeth for many months; that same woman is HIV positive and has had her blood drawn twice since coming to MCC, but has not received any results. Another woman stated that she entered the MCC with 20/20 vision but developed conjunctivitis that went untreated, despite her repeated requests for treatment (she showed us paperwork confirming her requests for treatment). She has now had 5 eye surgeries, including a corneal transplant, and is blind in her left eye.

**Additional notes**

Several women described being regularly locked down for 14 hours per day, not because of any particular event or security concern, but as a daily schedule:
- They are released from their cells in the morning between 6:30-7:30 AM each morning;
- sent back to their cells from 8-10 am while orderlies clean the unit (the doors are not locked but they are written up if they come out of their cells during this period);
- they are locked in again from 3:30-5 for the count;
- and then locked in for the night at 9:30.

Two women asked to speak with me privately (which was not possible during this tour) about concerns relating to the conduct of particular COs. I will follow-up on this with their lawyers, and, if appropriate, report back on these issues.

There had been multiple prior complaints (and a hearing was held last year in the EDNY on this issue) regarding sanitary napkins only being available in commissary (and thus unavailable to indigent women), or only being provided in a very limited quantity, e.g., two sanitary napkins per woman per menstrual cycle.  The women reported that since January – when the First Step Act passed – these supplies have improved.

Many women praised their new case manager (Olivera) as caring for them, and giving them a second or even third pair of underwear (instead of just one pair) and trying to improve their conditions.

Finally, it is noteworthy that Adam Johnson of the Legal Department arranged this tour voluntarily, without need of a court order.

# EXHIBIT D

3/29/19

I Cindy Carrillo #76049-054
Inmete here at MCC on Dec 8th, 2018
Aurora Sanchez had an incident and
hurt her left knee. Ms Sanchez was
brought to the S.H.O. I notice that
Ms. Sanchez was limping and asking
for the Doctor. That night on the 8th
the officer on duty kept asking thet
P.A. to see Ms. Sanchez and nobody did.
My Room is acrossed from the room
Ms. Sanchez was being held in and all
night. I heard her cry in pain and
asking for the Doctor. She was denied
that right. It 3 months later and
Ms. Sanchez is still limping and in
pain and hasn't gotten the proper
Medical Care she needes.

Sincerely,

Cindy Carrillo
Cindy Carrillo

23rd April 2019

STEPHEN A. ESPINET
Notary Public, State of New York
No. 01ES6194593
Qualified in Kings County
Commission Expires October 6, 20 20

To Whom It May Concern,

I, Dürra Mehdiyeva #76208054, have witnessed that Aurora Sanchez has injured her left knee due to an incident that occured on December 8, 2018.

Her knee looked red, massively swollen with some visible liqued. She was crying for help and begged to be seen by a Doctor or a PA, but was neglected and left to suffer in pain for at least or about 3 days, until she was finally taken to the hospital.

To this day, Ms. Sanchez complains about a regular pain in her leg and she has been limping ever since as well.

I hope she will get the proper medical care needed and will be able to live a pain-free life as soon as possible.

Respectfully,
Dürra Mehdiyeva

28th April 2019

STEPHEN A. ESPINET
Notary Public, State of New York
No. 01ES6194593
Qualified in Kings County
Commission Expires October 6, 20 20

3/14/19

I Marie Palumbo witnessed that Aurora Sanchez was braqnt to the S.H.U at M.C.C On December 8th 2018 and had No medical Attention at all. It was very obvious that her Left Knee was Swollen. She was limping and asking for the doctor. That night on the 8th the office- on duty kept asking the P.A to see Aurora and nobody did. It wasn't unitill aprox 3 days later that Aurora Saw a doctor and was taken out to the hospital. My Room was acrossed from the room Ms Sanchez was being held in and all night I heard her cry in pain and asking to Pleese get a doctor. She was denied that night. Here it is 3 Months later and Aurora is Still limping around, her knee is Still Swollen and She is Still in Obvious Pain. I am in the medical feild and and from my expertise it is Clearly Obvious that there is something wrong.

Sincerely:
Marie Palumbo

X Marie Palumbo

14th March 2019

STEPHEN A. ESPINET
Notary Public, State of New York
No. 01ES6194593
Qualified in Kings County
Commission Expires October 6, 20 20

3/21/19

To whom it may concern:

I Gissette Rivera am writing in regards to the lack
of medical attention that I and A. Sanchez have
been denied. On Dec 4th 2018 I got injured and
on Dec 8th 2018 she was injured they did not
bring us to the hospital until Dec 11th 2018. They
requested a cat scan for me and an MRI for her.
It still has not been taken care of and it is
now ~~Jan. 18~~ March 18th 2019.

Sincerly,
Rivera, Gissette

72653-054

21st March 2019

STEPHEN A. ESPINET
Notary Public, State of New York
No. 01ES6194593
Qualified in Kings County
Commission Expires October 6, 2020

3/21/19

To Whom It May Concern,

I, Asia Siddiqui #85797-053, took notice that Aurora Sanchez was injured on her left leg on December 8, 2018 and did not receive immediate medical care. Sanchez's left leg around her knee area was immensely swollen and she could be heard crying from the solitary housing unit (SHU) in which she was placed for the next couple of days before she was taken out.

Sincerely,

Asia Siddiqui

21st March 2019

STEPHEN A. ESPINET
Notary Public, State of New York
No. 01ES6194593
Qualified in Kings County
Commission Expires October 6, 2020

# EXHIBIT E

## CERTIFICATION

## CPR and AED

Aurora Sanchez

has successfully completed and competently performed
the required knowledge and skill objectives for this program.

☐ Adult   ☐ Adult and Child   ☒ Adult, Child, and Infant

*Card is void if more than one box is checked.*





Thomas Cox
Authorized Instructor (Print Name)

693240
Registry No.

4/6/19
Class Completion Date

4/6/21
Expiration Date

212-3461860
Training Center Phone No.

2392161
Training Center I.D.

This card certifies the above named individual has successfully completed the required objectives
and hands-on skill evaluations to the satisfaction of a currently authorized ASHI Instructor. This
program conforms to the 2015 AHA Guidelines Update for CPR and ECC. Expiration date may not
exceed two years from month of class completion.

AMERICAN
SAFETY &
HEALTH
INSTITUTE

# Pace University

## Dyson College of Arts & Sciences

### CERTIFICATE OF SUCCESSFUL COMPLETION
### PARENTING INSIDE OUT

THIS CERTIFIES

*Aurora Sanchez*

HAS ATTENDED AND COMPLETED 32 PROGRAM CLASS HOURS

WITH THE FOLLOWING CORE COMPONENTS:

**Communication, Problem Solving, Monitoring**
**Positive Reinforcement, Non-Violent Discipline Techniques, & CPR/First AID**

MANHATTAN, NY
April 9, 2019

Dr. Kimberly Collica-Cox
Associate Professor, Criminal Justice/Pace



parenting
inside
out

# Metropolitan Correctional Center

New York, New York

## *Aurora Sanchez*

has satisfactorily completed

### INMATE COMPANION TRAINING

and is hereby awarded this

## *Certificate of Achievement in Suicide Prevention*

On March 30th, 2019

Elissa Miller, Psy.D.
Chief Psychologist

L. N'Diaye, Warden

Darlene Imeri, Psy.D.
Staff Psychologist and Coordinator

# AURORA SANCHEZ

*CONGRATULATIONS*

on completing the intensive course of study,

*Parenting, Prison, & Pups*

at the

*Metropolitan Correctional Center New York.*



## GRADUATE

## Parenting, Prison, & Pups

April 9, 2019

L. R. Johnson
Education Specialist
Parenting, Prison, & Pups Program Coordinator
MCC New York Education Department

Kids are like a mirror.
What they see and hear
They do.
Be a good
Reflection
For them.
~ K. Heath

Remember.
The kids who need
The most love
Will ask for it
In the most
Unloving ways.
~ Russel Barkley

Whatever you would
Have your children
Become,
Strive to exhibit
In your own lives
And conversation.
~ Lydia H. Sigourney